## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

KIRK W. STEPHENS          )
                                  )
     Plaintiff,         )
                                  )
     VS.                )     CAUSE NO. 1:13-CV-66
                                  )
CAROLYN W. COLVIN,       )
Acting Commissioner     )
of Social Security      )
                                  )
     Defendant.        )

## <u>OPINION AND ORDER</u>

This matter is before the Court for review of the Commissioner of Social Security's decision denying Supplemental Security Income ("SSI") to Plaintiff, Kirk W. Stephens ("Stephens"). For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


<u>BACKGROUND</u>

On May 22, 2008, Stephens applied for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* This application was denied initially on July 15, 2008. Stephens filed a new application for SSI on March 31, 2010, alleging disability beginning January 5, 2007. This claim was denied

initially on July 17, 2010, and upon reconsideration on November 10, 2010.  In response, Stephens filed a written request for a hearing on January 7, 2011.

On September 16, 2011, Stephens appeared with counsel before Administrative Law Judge ("ALJ") Yvonne K. Stam ("Stam") in Fort Wayne, Indiana.  Stephens testified at the hearing, as did Robert S. Barkhaus, Ph.D., a vocational expert ("VE").  On October 24, 2011, the ALJ issued a decision finding Stephens not disabled. (Tr. 16-24).

Stephens requested that the Appeals Council review the ALJ's decision, and this request was denied.  As a result of the denial, ALJ Stam's decision became the Commissioner's final decision.  *See* 20 C.F.R. § 422.210(a).  Stephens has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).


DISCUSSION

Stephens was born on May 23, 1957, and was 49 years old at the date of the alleged disability onset, and 54 at the time of the ALJ's decision.  He has a ninth grade education.  Stephens' past relevant work experience includes work as a taxi dispatcher and security officer.

Plaintiff initially alleged that he suffered from the following medical conditions: type 2 diabetes, hypertension,

stage three chronic kidney disease, heart disease, back injury, asthma, and arthritis. (Tr. 72, 187). He later alleged that he also suffered from morbid obesity, COPD, thoracic degenerative disc disease, lumbar spondylosis, edema in the feet and lower legs, urinary and fecal incontinence, sleep apnea, and side effects from his medications. The medical evidence can be summarized as follows:

Stephens was diagnosed with Type 2 diabetes and hypertension at least as early as August of 2004. (Tr. 228-29). He received regular treatment for these conditions for several years. (Tr. 228-40).

Dr. Kinzi Stevenson examined Stephens on June 28, 2008, after Stephens filed his first application for benefits, at the request of the state disability determination agency. (Tr. 241-44). Stephens reported to Dr. Stevenson that he had been diagnosed with diabetes about ten years earlier and hypertension ten to twelve years earlier. (Tr. 241). Dr. Stephenson found Stephens "positive for vision loss, glasses, vertigo, epistaxis, pneumonia, wheezing, murmur, chest pain, edema, palpitations, and hernia." (Tr. 242). Dr. Stephenson found that Stephens "ambulates normally" and was able to get on and off the exam table and chair without trouble. (Tr. 242). He also found that Stephens had 5/5 handgrip strength and motor strength of 5/5 in

upper and lower extremities bilaterally. (Tr. 243). According to Dr. Stevenson:

> The patient was very cooperative and did seem to put forth good effort during the exam. I could not appreciate any limitations in sitting, lifting, carrying, seeing, hearing or speaking. There appears to be very mild neuropathy present, however he still appears able to walk long distances and on uneven terrain. The patient does not use any assistive device for ambulation. ... The patient complains of chest pain and it is suggestive of angina.

(Tr. 244).

In June of 2009, Dr. Steven Orlow performed a left heart catheterization. (Tr. 249-52). He found mild to moderate coronary artery disease and recommended medical management. (Tr. 249).

Also in June of 2009, Stephens saw Dr. Mark Meier, M.D. (Tr. 328-29). Stephens reported "a constellation of symptoms which include fatigue and shortness of breath" as well as chest discomfort. (Tr. 328). Dr. Meier's impression was:

> 1. Exertional chest discomfort with dyspnea, concerning for unstable angina.
> 2. Multiple risk factors including diabetes, hypertension, obesity, history of tobacco use, and dyslipidemia.
> 3. Chronic renal insufficiency, creatinine 1.5.

(Tr. 329). Dr. Meier indicated Stephens needed a cardiac catheterizaiton and nonselective renal angiogram. (Tr. 329). He

prescribed nitroglycein and directed him to see a dietician for consultation regarding diet and weight loss. (Tr. 329).

On July 28, 2009, Stephens was seen by Hector Perez, M.D. at the vascular medicine clinic. (Tr. 326-27). Dr. Perez calculated Stephens' BMI at 41. (Tr. 326). Dr. Perez' impressions were:

1. Hypertension, suboptimally controlled.
2. Dyspnea on exertion associated with chest tightness.
3. Known nonobstrutive coronary artery disease with a 60% circumflex lesion.
4. Hyperlipidemia.
5. Stage III chronic kidney disease.
6. History of tobacco abuse, currently abstaining.
7. Asthma.

(Tr. 326).

A nuclear cardiology exam was performed in May of 2010 due to coronary artery disease, dyspnea on exertion, and chest pain. (Tr. 411-12). The study revealed normal myocardial perfusion and function without regional variation and a normal stress ECG response. (Tr. 411).

In June of 2010, Stephens was seen by David Ringel, D.O., for a Disability Determination Examination. (Tr. 412-15). Stephens reported that he had been diagnosed as having heart disease with a 65% blockage. (Tr. 412). Stephens' hypertension was "well controlled" at the time. (Tr. 412). He reported arthritis in both knees, right ankle, shoulders, and mildly in his hands. (Tr. 412). According to the report, Stephens could dress and make meals, but could only stand for five to six

minutes and a total of less than thirty minutes over an eight hour period. (Tr. 412). Stephens could only lift up to fifteen pounds and could only drive a car for up to an hour. (Tr. 412). He is able to do household chores and grocery shopping, but he needs "slight adjustments and some assistance." (Tr. 413).[1]

Dr. Ringel found Stephens to have a slightly impaired gait, and that he moaned as he pulled himself out of his chair. (Tr. 413). Stephens had edema of the feet and lower legs. (Tr. 413). Stephens' grip strength was 4/5 on his right hand, and 3/5 on his left hand. (Tr. 413). He has full range of motion with his cervical spine, but has restrictions in his lumbar spine, and he is only able to do a partial squat with pain. (Tr. 413). Dr. Ringel attributed most of Stephens' physical symptoms to his back injury. (Tr. 415). He also noted that Stephens walked with a slight limp but did not need an assistance device. (Tr. 415). Furthermore, he found that Stephens suffered from "some loss of find motor control of both hands." (Tr. 415).

X-rays of Stephens left hand and wrist showed moderate to advanced degenerative changes in June of 2010. (Tr. 432, 434-35). An x-ray of Stephens' lumbar spine from July of 2010 showed degenerative disc changes from T10-T11 through L1-L2, but no change since a previous x-ray. (Tr. 418, 430-31). X-rays of

---

[1] Each of the limitations referenced in this paragraph appears to be based on Stephens' self-report rather than the doctor's examination of Stephens. (Tr. 412).

Stephens' knees showed a small patellar spur or osteophyte on the right knee but were otherwise normal.  (Tr. 429).

On July 6, 2010, Stephens saw Dr. Sanjay Jain in the pulmonary and sleep-disorders clinic.  (Tr. 444-46).  He diagnosed moderately severe COPD, probable concomitant sleep apnea, obesity, hypertension, diabetes mellitus, chronic kidney disease, and allergic rhinitis.  (Tr. 445).  He recommended a sleep study; that study confirmed obstructive sleep apnea.  (Tr. 445, 454-81).

Also in July of 2010, Dr. Sands completed a physical residual functional capacity assessment for Stephens.  (Tr 420-27).  Dr. Sands believed Stephens could lift 20 pounds occasionally and 10 pounds frequently, stand and sit about 6 hours in an 8-hour workday, and was unlimited in his ability to push and/or pull.  (Tr. 421).  Dr. Sands recommended that Stephens be limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  (Tr. 422).

On August 24, 2010, Stephens was seen by Dr. Shantunu Kulkarni, DO.  (Tr. 490-91).  Dr. Kulkarni's impression was thoracic degenerative disc disease, lumbar pain, and lumbar spondylosis.  (Tr. 491).  He recommended a lumbar facet steroid joint injection and a home exercise program with physical therapy.  (Tr. 491).

On August 26, 2010, Stephens saw Dr. Christopher LaSalle, M.D. (Tr. 488). Stephens reported sharp stabbing pain rated at 7 out of 10. (Tr. 488). Dr. LaSalle's impression was "Left Wrist Degenerative Osteoarthritis thumb CMC joint." (Tr. 488). Treatment options, including surgery, were discussed. (Tr. 488).

Dr. Eric Jenkinson, M.D. diagnosed Stephens with bilateral knee degenerative osteoarthritis. (Tr. 482-86). In August and September, Dr. Jenkinson performed a series of three injections in Stephens' knees. (Tr. 482-86). Stephens reported little improvement in his knee pain. (Tr. 486).

On October 12, 2010, Stephens saw Dr. Jenkinson. (Tr. 608-12). Jenkinson diagnosed cervical and shoulder pain. (Tr. 609). A home exercise program was recommended to strengthen his rotator cuff and improve function. (Tr. 609). Stephens' BMI was 43.95. (Tr. 609).

Stephens is on many different medications, and the record reflects many changes in his medication regimen. In May of 2011, Stephens was taking asprin, benadryl, carvedilol, clonidine, combivent, diovan, furosemide, glyburide, hydralazine, hydrocodone-acetaminophen, levemir, loratadine, magnesium oxide, novolog, omperazole, ProAir HFA, simvastatin, symbicort, and tramadol. (Tr. 524).

Stephens testified that he lives in Fort Wayne, Indiana, with his mother and uncle. (Tr. 35). He had not worked since

May of 2008. (Tr. 36). A typical day for Stephens included taking his medicine and shots, eating meals, playing with his dog, and watching television. (Tr. 47). He normally does not leave town, but he drives to doctor appointments and grocery stores. (Tr. 48). Stephens testified that his medications caused him to be tired, and that it was hazardous when he was driving a taxi. (Tr. 36).

Stephens testified that if he gets overexerted, which is caused by physical activity, he has to use an inhaler due to his COPD. (Tr. 41-42). He uses a scooter when he shops for groceries, both because he would get out of breath and his legs would hurt too much. (Tr. 42). He testified that he has a lot of pain in his knees, hip, and lower back. (Tr. 42-43). Prostate problems cause him to take a bathroom break every hour. (Tr. 44).

He testified that he can stand between five and ten minutes before needing to take a break, and can only walk approximately one hundred feet before needing to stop. (Tr. 45-46). He estimates he could sit for about a half hour. (Tr. 46). He believes he could lift about 10 pounds. (Tr. 46).

He said that his medications cause him to fall asleep two to three times during the day. (Tr. 50). He testified that he has difficulty looking at a computer screen for more than a half an hour before having problems with his vision. (Tr. 51-52).

<u>Review of Commissioner's Decision</u>

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.

-10-

42 U.S.C. §§ 423(d)(1)(A).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity? If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3:   Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's listing of impairments, as described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4:   Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to step 5, where the burden of proof shifts to the Commissioner.

Step 5:   Is the claimant able to perform any other work within his residual functional capacity in the national economy? If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Stephens had not engaged in any substantial gainful work since March 31, 2010, the application date.  (Tr. 18).  At step two, the ALJ found that Stephens suffered from chronic kidney disease, diabetes mellitus, osteoarthritis, obesity, and chronic obstructive pulmonary disease ("COPD").  (Tr. 18).

At step three, the ALJ found that Stephens did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 19). In doing so, the ALJ found that Stephens' osteoarthritis of the spine did not meet or medically equal listing 1.04 because there was no evidence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication. (Tr. 19). The ALJ concluded that Stephens' osteoarthritis of the knee fell short of listing 1.02 because the listing required "gross anatomical deformity with limitation of motion and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint with inability to ambulate effectively" and the record did not support those findings. (Tr. 19). In addition, the ALJ found that Stephens' COPD did not meet or medically equal listing 3.02 because he did not meet the required FEVI reading. (Tr. 19). Finally, the ALJ found that Stephens had an "extreme" level of obesity, and that while there was no listing that considers obesity, the ALJ had "considered the aggravating effects of obesity on the claimant's other impairments" as required by SSR 02-1p. (Tr. 19).

The ALJ then found that Stephens had the residual functional capacity to:

> lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, sit

for about six hours in an eight-hour workday, stand and walk in combination for about six hours in an eight-hour workday, occasionally climb, balance, stoop, kneel, crouch and crawl, and he must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases and poor ventilation.

(Tr. 19). The ALJ concluded that Stephens' "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 20).

Finally, at step four, the ALJ relied on the testimony of the VE to conclude that the ALJ found that Stephens was capable of performing his past relevant work as either a security officer or a taxi dispatcher. (Tr. 23). As a result, the ALJ found that Stephens had not been under a disability, as defined in the Social Security Act, from March 31, 2010, through the date of the decision. (Tr. 23-24).

Stephens believes that the ALJ committed several errors. Stephens argues that the ALJ failed to properly consider the side effects of Stephens' medications, the medical opinion of Dr. Ringel, and the effect of Stephens' obesity on his other ailments. Stephens also believes that ALJ committed error by ignoring certain impairments: heart disease, fecal incontinence, arthritis of the right ankle, and loss of fine-motor control in

his right hand.    Lastly, Stephens alleges that the ALJ's determination that Stephens is not credible is flawed.


Credibility

Stephens argues that the ALJ improperly discredited his testimony in violation of SSR 96-7p by relying on meaningless boilerplate language and failing to properly consider the seven credibility factors.  The Commissioner disagrees.

Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong.  *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).  However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence.  *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Further, "the ALJ cannot reject a claimant's testimony about limitations on [his] daily activities solely by stating that such testimony is unsupported by the medical evidence." *Id*.  Instead, the ALJ must make a credibility determination that is supported by record evidence and sufficiently specific to make clear to the claimant, and to any subsequent reviewers, the

weight given to the claimant's statements and the reasons for the weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of SSR 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002). This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p, 1996 WL 374186 (1996). Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or

her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186 (1996); C.F.R. §§ 404.1529, 416.929; *Golembiewski*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Here, ALJ Stam determined that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 20). Nearly identical language was criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). That criticism will not be repeated here. The boilerplate language utilized by ALJ Stam is unhelpful at best, and by itself, such language is inadequate to support a credibility finding. *See Richison v. Astrue*, No. 11-2274, 2012 WL 377674 (7th Cir. Feb. 7, 2012). But, where boilerplate language such as that utilized by the ALJ is accompanied by additional reasons, a credibility determination need not necessarily be disturbed if it is otherwise adequate. *Id.* The Commissioner argues that "the ALJ went beyond the canned language and adequately set forth the specific reasons

for finding the claimant not credible." (DE 18 at 9).
According to the Commissioner:

> In evaluating the credibility of Plaintiff
> [sic] subjective complaints, the ALJ
> properly considered numerous factors
> including: Plaintiff's alleged symptoms;
> factors that exacerbated Plaintiff's
> symptoms; Plaintiff's alleged medication
> side effects; Plaintiff's daily activities;
> the physician opinions of record; the
> objective clinical examination and
> diagnostic test findings; the fact that many
> of Plaintiff's impairments were controlled
> with treatment; and Plaintiff's failure to
> follow through with prescribed physical
> therapy (Tr. 20-23). The ALJ's credibility
> assessment in this case was quite thorough
> and was certainly not "patently wrong" as it
> would need to be in order for this Court to
> reverse it. *Schmidt v. Barnhart*, 395 F.3d
> 737, 746-47 (7th Cir. 2005); *Diaz v. Chater*,
> 55 F.3d 300, 305 (7th Cir. 1995).

(DE 18 at 8). Other than citing generally to the section of the
ALJ's opinion where the ALJ discusses the medical evidence and
makes her credibility determination, the Commissioner provides
no further explanation of why she believes the ALJ's credibility
analysis addressed all the factors listed above.

In her decision, the ALJ outlined the process for
determining a claimant's RFC, including the need to make a
credibility finding where statements about the intensity,
persistence, or functionally limiting effects of pain or other
symptoms are not substantiated by objective medical evidence.
(Tr. 20). The ALJ then summarized the claimant's testimony as
follows:

The claimant testified that he lives with his mother and uncle. He said he has not been able to work due to problems with breathing, pain in his back and legs, and prostate problems. He said he was a dispatcher for a taxi company from 1998 to 2000, but the payroll administrator was HR America as shown on his earnings records. He said he last drove a taxi in December 2007. He said he gets short of breath with activity. Also, his legs hurt if he walks too much. He has pain in his lower back, hips and knees. He said that before prostate surgery, he had leg swelling because of difficulty urinating. Since surgery, he has urinary urgency and occasional incontinence about two or three times a week. He said he needs to go to the bathroom about once per hour. He said he can stand five to 10 minutes, walk about 100 feet, sit for about 30 minutes, and lift and carry 10 pounds. He said it is now harder to climb stairs and shop for groceries than it was when he filed his prior claim. He said he can't stand long enough to cook or do dishes. He watches television, plays with his dog, and drives to appointments.

Under questioning by his representative, he said he had joint replacement surgery on his left hand, and he now has pain and can't use it fully. His right shoulder also hurts all the time. His medications make him tired. He said he doesn't have much energy. He falls asleep twice or more during the day. He said his eyes would get blurry and give him a headache after 30 minutes of looking at a computer screen or reading. He said he started using a CPAP machine for his sleep apnea, but it has not improved his daytime fatigue symptoms.

(Tr. 20). She then included the boilerplate language cited

earlier. (Tr. 20). The ALJ next offered this statement:

The claimant's medical record and his admitted activities are not consistent with

total disability.  Regarding activities, his
function report indicates that he has no
problems with personal care, cooks simple
meals, shops when necessary, plays games on
a computer, does household chores, drives to
appointments, does laundry, and mows grass
with a lawn tractor (Ex. 6E).  The medical
record shows that he has several conditions
that reasonably would limit his exertional
ability, especially since he filed the
current claim, but the evidence does not
establish limitations beyond those in the
above residual functional capacity.

(Tr. 21).

The ALJ then offered a summary of the medical evidence,
concluded that her RFC is consistent with the medical evidence,
and made no further comments regarding Stephens' credibility.
(Tr. 21-23).

This Court must decide whether there is a logical bridge
between the evidence outlined by the ALJ and the ALJ's
conclusions.  Here, outside of the criticized boilerplate
language, the ALJ has offered no explicit reason for finding
Stephens' testimony not credible.  Her statements suggest that,
because she believed neither the medical records nor Stephens'
activities of daily living were consistent with total
disability, she therefore thought Stephens' reports of his
limitations of function must be less than fully credible.  This
reasoning is insufficient.  As the ALJ's decision notes,
credibility determinations are made "whenever statements about
the intensity, persistence, or functionally limiting effects of

pain or other symptoms are not substantiated by the objective medical evidence." (Tr. 20). Accordingly, the whole point of the credibility determination is to determine whether the claimant's allegations are credible *despite* the fact that they are not substantiated by the objective medical records. Activities of daily living *are* a legitimate consideration, but the Seventh Circuit has cautioned against placing too much weight on a claimant's ability to engage in activities of daily living. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(the "ability to cook, clean, do laundry, and vacuum ... do not necessarily establish that a person is capable of engaging in substantial physical activity" and "[t]he ALJ should have explained any inconsistencies between [the claimant's] activities of daily living and the medical evidence.").

There are comments in the relevant section of the ALJ's decision that relate to some of the factors an ALJ is required to consider when determining if a claimant is credible: Stephens' alleged symptoms are summarized, the ALJ noted that Stephens claimed that activity caused shortness of breath, and the ALJ acknowledged that Stephens used a CPAP machine and reported a need to schedule bathroom breaks at one hour increments to avoid incontinence. The ALJ provided many details regarding both Stephens' testimony and the medical evidence. Unfortunately, she failed to link her statements to her finding

that Stephens is less than fully credible, leaving the Court to speculate regarding her reasons - something this Court cannot do. Furthermore, the ALJ failed to specify which of Stephens' statements are credible and which the ALJ discredited, leaving no basis for this Court to review whether the ALJ's conclusion is supported by substantial evidence. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (because "the ALJ did not analyze the factors required under SSR 96-7p," "the ALJ failed to build a logical bridge between the evidence and his conclusion that [claimant's] testimony was not credible.").

One factor of particular importance in this case is the side effects of medications. Stephens detailed his medications and their associated side-effects in his opening brief. (Pl. Br. 8-10). Among the many side-effects are "frequent urination," "extreme hunger," "tiredness," "drowsiness," "back pain," and "difficulty breathing." (DE 17 at 8-10). Tiredness or drowsiness are a possible side effect of at least seven of Stephens' medications: carvedilol, tramadol, vicodin, symbicort, diovan, clonidine, and omeprazole. Stephens testified at the hearing that the medications that he is on cause him to fall asleep a lot, which was dangerous when he worked as a taxi driver. (Tr. 36).

Given the sheer number of medications that Stephens takes that list fatigue and tiredness as possible side-effects, the ALJ was required to offer some explanation before discrediting Stephens' testimony regarding tiredness and fatigue. Because the necessary connections or "logical bridge" between the evidence and the ALJ's determination that Stephens is less than fully credible is lacking, this Court must remand.

<u>Obesity</u>

Stephens also alleges that the ALJ failed to properly assess his extreme obesity and its effects on his other impairments, as required by SSR 02-1p. (DE 17 at 16-20). SSR 02-1p notes that:

> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea. It is associated with endometrial, breast, prostate, and colon cancers, and other physical impairments. Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity- related sleep apnea.

SSR 02-1p, 2002 WL 34686281 (2002).  This ruling provides
guidance to ALJs regarding how to evaluate obesity at steps two
through five of the sequential evaluation.  At step two, an ALJ
is to find that obesity is severe "when, alone or in combination
with another medically determinable physical or mental
impairment(s), it significantly limits an individual's physical
or mental ability to do basic work activities."  *Id*.

At step three, because there is no listing for obesity,[2] the
ruling instructs ALJs as follows:

> [W]e will find that an individual with
> obesity "meets" the requirements of a
> listing if he or she has another impairment
> that, by itself, meets the requirements of a
> listing.  We will also find that a listing
> is met if there is an impairment that, in
> combination with obesity, meets the
> requirements of a listing.  For example,
> obesity may increase the severity of
> coexisting or related impairments to the
> extent that the combination of impairments
> meets the requirements of a listing.  This
> is especially true of musculoskeletal,
> respiratory, and cardiovascular impairments.
> It may also be true for other coexisting or
> related impairments, including mental
> disorders.
>
> *  *  *
>
> We may also find that obesity, by itself, is
> medically equivalent to a listed
> impairment[.]
>
> *  *  *

---

[2] Or, more accurately, there is no longer a listing for obesity.  Listing
9.09 was deleted in 1999.  *See Barthelemy v. Barnhart*, 107 Fed. Appx. 689 (7th Cir.
2004).

We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory systems must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or foundational limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1p, 2002 WL 34686281 (2002). At steps four and five, the ruling notes that obesity can cause limitation of function. Furthermore, the ruling notes that:

[t]he effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. ... In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

* * *

As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

SSR 02-1p, 2002 WL 34686281 (2002).

The Seventh Circuit has emphasized the importance of the principles set forth in SSR 02-1p. In *Martinez v. Astrue*, the Seventh Circuit found that the ALJ had committed several errors, but that the ALJ's gravest error was his failure to consider the impact of the claimant's obesity on other impairments – namely, a bad knee. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). "It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40." *Id.* The Seventh Circuit stressed the importance of considering an claimant's impairments in the aggregate. *Id.*

Similarly, in *Villano v. Astrue*, the Seventh Circuit held that an "ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

In Stephens' case, the ALJ identified obesity as a severe impairment at step two of the sequential analysis. (Tr. 18). And, at step three, the ALJ acknowledged that Stephens had a BMI over 40 and suffered "extreme" obesity. (Tr. 19). The ALJ also noted, without any further elaboration, that she "had considered the aggravating effects of obesity on the claimant's other impairments, as required by SSR 02-1P." (Tr. 19). At step four, the ALJ noted that Stephens had a BMI of 37.7 in June of 2008 (almost two years before his alleged onset date), and that he weighed 278 pounds in June of 2010. (Tr. 21-22). But, in determining Stephens' RFC, the ALJ made no further mention of his obesity and offered no analysis of how it might impact limitations imposed by his other impairments. This is especially troublesome where the ALJ found that Stephens suffered from diabetes mellitus, osteoarthritis, and COPD - each of which tends to be exacerbated by obesity. By failing to articulate how Stephens' extreme obesity interacted with his

other severe impairments, the ALJ committed error under *Martinez*.

Failure to consider the effect of obesity is subject to harmless-error analysis. *See Villano*, 556 F.3d at 562 (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-67 (7th Cir. 2006), and *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). Here, the Commissioner did not offer any response to Stephens' argument regarding the ALJ's failure to adequately address Stephens' obesity. In this case, reversal is required based on other errors. Accordingly, whether this error standing alone would have been harmless is irrelevant. On remand, Stephens' obesity must be properly considered in accordance with SSR 02-1p.


Impairments not Addressed by the ALJ

Stephens alleges that the ALJ ignored his heart disease, fecal incontinence, arthritis of the right ankle, and loss of fine-motor control in his right hand. (DE 17 at 21).

Each impairment a claimant has must be considered in determining whether they are disabled. The Seventh Circuit held in *Terry v. Astrue* that, "[a]lthough an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). While an ALJ can

discount the severity of an impairment, he should not ignore it all together. *Id.* "An ALJ must consider the combined effect of *all* of the claimant's impairments, even those that would not be considered severe in isolation." *Id.*

Likewise, in *Golembiewski v. Barnhart*, the Seventh Circuit noted the following:

> Incontinence constitutes an impairment under the Social Security Act that must be considered to determine whether an applicant is disabled. Evidence that Golembiewski's bladder impairment did not interfere with his work therefore would be a reason for the ALJ to discount the disabling nature of the problem, but it would not justify ignoring the problem entirely as the ALJ did here.

322 F.3d 912, 918 (7th Cir. 2003).

The Commissioner, in response to Stephens' argument, states that:

> The ALJ did not "ignore" Plaintiff's alleged impairments, but reasonably found that the record evidence did not support a finding that those impairments were more limiting than the ALJ found in his RFC finding.

(DE 18 at 7). The Commissioner provides no citation to where in the ALJ's decision the ALJ expressed this idea. That is because the ALJ did not. This Court can find no reference to heart disease, fecal incontinence, arthritis of the right ankle, or loss of fine-motor control in his right hand in the ALJ's decision. This Court cannot rely on the post-hoc reasoning provided by the Commission, and it is therefore disregarded.

*N.L.R.B. v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 715 n.1 (2001). The Commissioner does not deny that Stephens suffers from these impairments. The ALJ's failure to articulate whether Stephens has limitations due to these impairments was error.

CONCLUSION

For the reasons stated above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

**DATED: March 18, 2014**                  **/s/ RUDY LOZANO, Judge**
                                           **United States District Court**